**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

<table>
<tr><td>

ARCELIS MIRANDA RODRÍGUEZ on behalf and as legal guardian of minor P.V.M. and ARNEL ABRAHAM VALENTÍN MIRANDA,

        Plaintiffs,

           v.

MENNONITE GENERAL HOSPITAL, INC., DR. RAMÓN DOMÍNGUEZ ROCHE, his wife JANE DOE and their CONJUGAL PARTNERSHIP, THE MEDICAL PROTECTIVE COMPANY d/b/a MEDPRO GROUP INC. and/or MEDPRO, INSURANCE COMPANY A, INSURANCE COMPANY B, INSURANCE COMPANY C, INSURANCE COMPANY X, INSURANCE COMPANY Y AND INSURANCE COMPANY Z,

        Defendants.

</td><td>

**Civil. No. 21-01286**

</td></tr>
</table>

<u>**OPINION AND ORDER**</u>

    Defendant Mennonite General Hospital, Inc. ("Defendant" or "Hospital") moved for summary judgment and the exclusion of Plaintiff's expert witness, Dr. José Adams ("Dr. Adams"). (Docket No. 80). Defendant grounded its request in that Dr. Adams, allegedly: (a) failed to articulate the applicable standard of medical care for treating premature newborn babies of 34 weeks in hospitals that do not have a Neonatal Intensive Care Unit ("NICU"); and (b) did not reference medical literature to substantiate his opinions. The Hospital maintains that Fed. R. Evid. 702 and <u>Daubert</u>

Civil. No. 21-cv-01286**(GMM)**
Page -2-

v. Merrell Dow Pharms., 509 U.S. 579 (1993), substantiate its claim for exclusion.

Plaintiffs contend to the contrary. Their understanding is that, under Fed. R. Evid. 702, Dr. Adams could rely —solely— on his experience as a neonatologist and his review of the medical records.

The issue before the Court is, thus, whether Dr. Adams' testimony rested on reliable foundation, such that would assist the trier of fact in better understanding the evidence to determine the facts at issue as required by Fed. R. Evid. 702.

## I.   THE DAUBERT CHALLENGE

Because the Hospital's Motion for Summary Judgment (Docket No. 80) is inextricably related to the *in limine* request —dismissal is sought on presumptive absence of admissible and reliable expert testimony as to the duty owed by Defendant— the Court decides it first.

Defendant contends the exclusion of Dr. Adams' testimony entails an automatic failure to present a prima facie case of medical malpractice under Puerto Rico law. This, under local law, requires establishing: "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that

Civil. No. 21-cv-01286(GMM)
Page -3-

duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortés-Irizarry v. Corporación Insular De Seguros, 111 F.3d 184, 189 (1st Cir. 1997) (*citing* Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994); Rolón-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993)).

### A. Background[1] as to the *In Limine* Request

On June 15, 2021, Plaintiffs Arcelis Miranda Rodríguez, on behalf of minor P.V.M. ("P.V.M."), and Arnel Abraham Valentín Miranda (together, "Plaintiffs") filed an action for medical malpractice against Defendant. (Docket No. 1). They allege that Defendant's medical and nursing personnel in charge of overseeing newborn P.V.M.'s care, failed to diagnose, recognize, manage, and treat the newborn's respiratory distress. (Docket No. 1 ¶ 4.3). Plaintiff attests that medical examinations conducted later showed that P.V.M. developed hypertonia and right spastic hemiplegic cerebral palsy. (Docket No. 1 ¶ 3.21). Defendant's failure to recognize, manage, and treat the P.V.M.'s respiratory distress, as argued by Plaintiffs, was the proximate cause of P.V.M.'s severe and irreversible neurological damage. (Docket No. 1 ¶ 4.4).

---

[1] The Court limit its discussion to the relevant facts pertaining to Defendant's *in limine* request.

Civil. No. 21-cv-01286(GMM)
Page -4-

Plaintiffs retained Dr. Adams as their expert witness. He would testify about the cause of P.V.M.'s neurological damage, applicable medical standard, and Defendant's supposed deviation from the applicable standard of medical care. (Docket No. 85-11 ¶ 12). Dr. Adams qualifications include a medical degree from the Universidad Autónoma de Centro America Medical School in Costa Rica, followed by training in pediatrics and neonatology at the University of Miami and the Jackson Memorial Hospital. (Docket No. 80-2 at 1). Currently, he serves as the Director of Neonatology at Mount Sinai Medical Center in Miami, Assistant Professor of Clinical Pediatrics at the University of Miami Miller School of Medicine, and Professor of Pediatrics at the Florida International University School of Medicine. (Docket No. 80-2 at 1). Dr. Adams has been an attending neonatologist since 1989. (Docket No. 80-2 at 1). In total, Dr. Adams has 33 years of experience in "taking care of NICU neonatology." (Docket No. 80-4 at 2).

Dr. Adams rendered his expert report on December 16, 2021 ("Expert Report"). (Docket Nos. 80-1 ¶ 13 and 85-11 ¶ 13). He concluded that "a multitude of failures regarding the care of [P.V.M.] at [the Hospital], caused the severe irreversible neurological damages that [P.V.M.] is enduring to this day." (Docket No. 80-2 at 2). Dr. Adams detailed the following failures:

Civil. No. 21-cv-01286(GMM)
Page -5-

1.    The failure to immediately transfer this premature baby (34 weeks) from the [Hospital], who does not by their own admission have a Neonatal Intensive Care Unit (NICU), to a higher level of care contributed to PVM's continued deterioration;

2.    The delay in ordering P.V.M. to be transferred to another hospital with a higher level of care despite her obvious deterioration resulted in the baby being transferred at a point when she was too critically ill;

3.    The inability to recognize, manage, and treat respiratory distress in the newborn by physicians and nurses involved in the care; and

4.    The failure to provide a timely airway and evacuation of pneumothoraxes.

(Docket no. 80-2 at 2).

Moreover, Dr. Adams opined that "[t]hese acts and omissions by [Defendant]. . .significantly deviated from the applicable standard of care. . ." (Docket No. 80-2 at 2). In basing his opinion and conclusion, Dr. Adams indicated he reviewed the following documents, in addition to "utilizing standards set forth in the field of pediatrics and neonatology at the time of the events":

1.    Medical records from [the Hospital] for P.V.M.'s mother, Mrs. Araceli Miranda's admission on July 13, 2000;

2.    Medical records dated July 13, 2000, from [the Hospital] corresponding to P.V.M.;

Civil. No. 21-cv-01286(GMM)
Page -6-

   3.   Medical records dated July 14, 2000, from San Lucas
        Episcopal Hospital corresponding to P.V.M.;

   4.   Defendant's response to Interrogatory No. 16
        rendered on December 8, 2021; and

   5.   Report of Medical Opinion from Dr. Trevor Resnik
        dated December 12, 2021.

(Docket No. 80-2 at 1-2).

     Dr. Adams was deposed on August 1, 2022. (Docket No. 85-11 ¶

39).   He acknowledged the lack of citations or references to

medical literature in his Expert Report. Dr. Adams testified that

he grounded his expert opinion on 33 years of experience in taking

care of NICU neonatology, as well as the relevant medical records.

(Docket No. 80-4 at 2, 8, and 9).

     On September 8, 2022, Dr. Adams rendered a supplemental report

("Supplemental Report"). (Docket No. 80-3). He reiterated his

opinion as to Defendant's four (4) failures and indicated that

"[b]ecause [Defendant] was a Level 1 Basic Care Facility [,] it

did not have the experienced personnel or equipment required to

provide this premature baby the treatment she required at birth."

(Docket No. 80-3 at 1). Furthermore, Dr. Adams opined that

        the applicable standard of care required the [Hospital]
        to transfer this preterm baby, who presented with
        respiratory difficulty shortly after birth requiring
        oxygen support, to a higher standard of care facility
        (specialty or subspecialty care facility). Based on the

Civil. No. 21-cv-01286(GMM)
Page -7-

> clinical evolution of this preterm baby at the
> [Hospital], it was more likely than not that the baby
> would continue deteriorating if kept under basic care.

(Docket No. 80-3 at 1).

As part of his Supplemental Report, Dr. Adams further
highlighted instances where Defendant's medical and nursing
personnel were on notice, or should have known, of P.V.M.'s
unstable condition, which required her transfer to a higher level
of care facility. (Docket No. 80-3 at 2). Dr. Adams included two
sources for his opinion and conclusion: (i) GUIDELINES FOR PERINATAL
CARE, Fourth Edition (1997)[2]; and (ii) NEONATAL RESUSCITATION TEXTBOOK,
Fourth Edition (2000). (Docket Nos. 80-3 at 2, and 85 ¶¶ 5-6).
Defendant did not depose Dr. Adams after he rendered his
Supplemental Report. (Docket No. 85-11 ¶ 39). The foregoing serves
as the backdrop for Defendant's request to exclude Dr. Adams'
expert witness testimony under Daubert, *supra*, Fed. R. Evid. 702,
and Fed. R. Civ. P. 26.[3] (Docket No. 80 at 9-19).

---

[2] The GUIDELINES FOR PERINATAL CARE "reflected the latest recommendations of the
American Academy of Pediatrics and the American college of Obstetrics and
Gynecology, which are national professional associations that produce national
practice guidelines." (Docket No. 85-1 ¶ 6).

[3] Defendant also referenced Fed. R. Evid. 703. It failed, however, to develop
argumentation as to pertinence or applicability. As such, the Court deems it
waived. *See* U.S. v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990); Rivera-Gomez v. de
Castro, 843 F.2d 631, 635 (1st Cir. 1988)(*quoting* Paterson-Leitch Co. v.
Massachusetts Municipal Wholesale Elec. Co., 840 F.2d 985, 990 (1st Cir. 1988).

Civil. No. 21-cv-01286(GMM)
Page -8-

In sum, the Hospital argues that Dr. Adams' testimony is inadmissible because Plaintiff failed to: (i) present expert testimony that establishes the applicable national standard of medical care in July of 2000; and (ii) cite or reference medical literature. (Docket No. 80 at 9-18). Plaintiffs' response is twofold: (i) under Fed. R. Evid. 702, Dr. Adams could base his expert opinion on his 33 years of experience working as a neonatologist and his review of the relevant medical records only; and, in any case, (ii) Dr. Adams referenced medical literature in his expert testimony and established the national standard of medical care in July of 2000.

### B. Applicable Law

<u>Federal Rule of Evidence 702</u>

Fed. R. Evid. 702 controls the admissibility of expert witness testimony. *See* <u>Crow v. Marchand</u>, 506 F.3d 13, 17 (1st Cir. 2007) ("The touchstone for the admission of expert testimony in federal court litigation is Federal Rule of Evidence 702."). The Rule dictates:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, Fed. R. Evid. 702 assigns a "gatekeeping role for the judge" to ensure that the expert is "sufficiently qualified to assist the trier of fact" and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 597. To aid trial judges in their role as gatekeepers, the Daubert Court set forth several factors that may be taken into consideration, none of which are determinative: (i) whether a theory or technique can and has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether the particular scientific technique has a known or potential rate of error; and (iv) the "general acceptance" of a theory or technique. See Daubert, 509 U.S. at 593-94. Therefore, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General

Civil. No. 21-cv-01286(GMM)
Page -10-

Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Note, however, the difference between an "unreliable" support and an "insufficient" support for an expert witness' conclusion. *See* Martínez v. United States, 33 F.4th 20, 24 (1st Cir. 2022) (*quoting* Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 22 (1st Cir. 2011)). Whether the underpinning of an expert's opinion is insufficient is "a matter affecting the weight and credibility of the testimony – a question to be resolved by the jury." Id. (*quoting* Milward, 639 F.3d at 22).

Lastly, "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." Id. (*quoting* Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006)).

Federal Rule of Civil Procedure 26

Fed. R. Civ. P. 26 requires from a party that intends to use a Fed. R. Evid. 702 witness at trial, to submit a written report. *See* Fed. R. Civ. P. 26(a)(2). The written report required by Fed. R. Civ. P. 26 must contain, among other things, "a complete statement of all opinions the witness will express" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i) and (ii). Further, Rule 26(e)(2) requires

parties to timely supplement expert witness testimony if any changes to the expert's opinion arise:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2). Pursuant to Rule 26, a timely disclosure is one that is made at least 30 days before trial. *See* Fed. R. Civ. P. 26(a)(3)(B).

### C. Analysis and Conclusion of the <u>Daubert</u> Claim

First, there is no challenge to Dr. Adams' qualifications. He has over three decades of experience in NICU neonatology and is the Director of Neonatology at Mount Sinai Medical Center in Miami. Together with other academic and professional background, the Court concludes that Mr. Adams is qualified to testify.

As to <u>Daubert</u>, for Dr. Adams' expert testimony to be admissible, it must be <u>reliable and relevant</u>. The reliability factor goes to the scientific foundation of Dr. Adams' expert testimony. The relevance factor focuses on whether Dr. Adams' expert testimony can assist the trier of fact in understanding the evidence. To be reliable and relevant, Dr. Adams' expert testimony must validly connect the science to the facts of this case.

Civil. No. 21-cv-01286(GMM)
Page -12-

The crux of Defendant's argument is that Dr. Adams' expert testimony is not based on a reliable foundation due to its failure to "provide an opinion in his Expert Report as to what was the national standard of medical care in July of the year 2000 as to treating premature newborn babies in hospital without [NICU]." (Docket No. 80 at 12). Likewise, the Hospital insists on Dr. Adams' presumed failure to cite or reference any medical literature. (Docket No. 80 at 15).

Foremost, Dr. Adams' expert testimony did not have to include the standard of medical care in July of the year 2000 as to the treating of <u>any</u> premature newborn baby of 34 weeks in a hospital without a NICU. Rather, his expert testimony needed to include the standard of medical care in July of the year 2000 as to treating premature newborn babies of 34 weeks <u>showing respiratory distress</u> in a hospital without a NICU. Further, Dr. Adams' expert testimony needed to link the applicable standard of medical care to the facts and evidence of this case. Dr. Adams' expert testimony plainly made the connection. The Court , nonetheless, discusses the foundational shortcomings, or lack thereof, of Dr. Adams' expert testimony.[4]

---

[4] Because Defendant has not challenged Dr. Adams' expert testimony on relevance grounds, the Court limits the discussion to the reliability criteria.

Civil. No. 21-cv-01286(GMM)
Page -13-

Dr. Adams' Expert Report

Defendant posits that Dr. Adams fully omitted the applicable standard of medical care in his Expert Report. The text, however, points on a different direction:

...

Based on a reasonable degree of medical certainty, **utilizing standards set forth in the field of pediatrics and neonatology at the time of the events,** and based on the records and documents provided to me as listed above, it is my opinion that a multitude of failures regarding the care of this baby at Mennonite General Hospital, Aibonito, caused the severe irreversible neurological damages that PVM is enduring to this day. Specifically, these failures are:

a. **The failure to immediately transfer this premature baby (34 weeks) from the [Hospital], who does not by their own admission have a Neonatal Intensive Care Unit (NICU), to a higher level of care contributed to PVM's continued deterioration;**

b. **The delay in ordering PVM to be transferred to another hospital with a higher level of care despite her obvious deterioration resulted in the baby being transferred at a point when she was too critically ill;**

c. The inability to recognize, manage, and treat respiratory distress in the newborn by physicians and nurses involved in the care; and

d. The failure to provide a timely airway and evacuation of pneumothoraxes.

Civil. No. 21-cv-01286(GMM)
Page -14-

**These acts and omissions by Mennonite General Hospital, which significantly deviated from the applicable standard of care,** caused PVM to enter into full respiratory-cardiac arrest, leading to the severe hypoxic ischemic encephalopathy (HIE).

...

(Docket No 80-2 at 2) (emphasis added).

Dr. Adams' understanding of the applicable standard of care at the time of the events, as sustained by Plaintiffs, percolates from a cursory reading: Defendant, a hospital without a NICU, needed to transfer P.V.M., a premature baby of 34 weeks —in continued deterioration— to a higher level of care facility. Plaintiff's case theory, in part, is that Defendant's failure to transfer P.V.M. to a higher level of care facility is, in and of itself, a deviation from the applicable standard of care. This omission, Plaintiffs contend, resulted in the irreversible neurological damages that P.V.M. suffered and continues to endure to this day.

In the Court's view, Dr. Adams' indication in his Expert Report as to his utilization of the applicable standard of care during the time of the events, his 33 years of experience in NICU neonatology, together with the review and study of relevant medical records, surmount the reliability and relevance requirements of Fed. R. Evid. 702.

Civil. No. 21-cv-01286(GMM)
Page -15-

<u>Dr. Adams' Deposition Testimony</u>

Dr. Adams expressly identified the applicable standard of care in July of 2000:

> Well, **if you look at the standard of care in the year 2000,** okay, well-baby nurseries do not take care of premature babies. They transfer out premature babies. Why? Because premature babies have a higher risk of having complications throughout their hospital stay much higher than full-term babies.
>
> ...
>
> **. . .if a premature baby is born at a hospital and this hospital cannot provide care for this premature baby, which they can't, okay, they don't have a [N]ICU.** They can't provide support and CPAP and so on and so forth that's needed. That's why they're designated as Level 2 and 3s.
>
> Level 1 care is basically well-baby care. **And a premature baby, okay, doesn't belong in a well-baby care because – and particularly this one. [P.V.M.] started out requiring 50, 60 percent oxygen. What are you doing with that? That baby will get worse over time.**

(Docket No. 85-2 at 48 and 51) (emphasis added).

Again, the applicable standard of care at the time of the events can be discerned from Dr. Adams' expert testimony: if a premature baby of 34 weeks is born at a basic care facility, and that baby shows signs of respiratory distress, then the standard of care requires that the unhealthy premature baby be transferred to a more specialized facility equipped to take care of the baby's condition.

```
Civil. No. 21-cv-01286(GMM)
Page -16-
```

Dr. Adams' Supplemental Report

Dr. Adams Supplemental Report further included the applicable standard of care and cited the relevant medical literature:

...

Because the [Hospital] was a Level 1 Basic Care Facility it did not have the experienced personnel or equipment required to provide this premature baby the treatment she required at birth. This premature baby should have been treated by a neonatologist and received the benefit of effective and timely intubation. **As a Basic Care Facility, the applicable standard of care required [the Hospital] to transfer this preterm baby, who presented with respiratory difficulty shortly after birth requiring oxygen support, to a higher standard of care facility (specialty or subspecialty care facility). Based on the clinical evolution of this preterm baby at the [Hospital], it was more likely than not that the baby would continue deteriorating if kept under basic care.**

...

Considering the respiratory distress this baby was having, constant monitoring of saturations was needed. During the stabilization-transition period, the neonate's temperature, heart and respiratory rates, skin color, adequacy of peripheral circulation, type of respiration, level of consciousness, tone, and activity should be monitored and recorded at least once every 30[] minutes until the neonate's condition has remained stable for 2 hours. After her documented saturation of 97% was taken on July 13th at 11:00am, there are no further saturations until 13.5[] hours later. The saturation of 12:30am of July 14th was documented by the Hospital's nursing staff to be 85% even while receiving oxygen via Oxyhood at 50-60%. **This is consistent with an unstable premature baby that needed to receive treatment a higher level of care facility.** Both Dr. Dominguez and the nursing staff failed to realize that this premature baby that was continuously assisted by oxygen, receiving maintenance IV fluids and with signs and symptoms of

Civil. No. 21-cv-01286(GMM)
Page -17-

respiratory difficulty could not remain at a Level 1
facility and needed to be immediately transferred.
Pursuant to the nurses' notes, there was abundant
evidence that this premature baby was unstable and
needed to be transferred. **The obvious signs and symptoms
required the nursing staff to actively pursue the
transfer via Dr. Dominguez and, in the alternative, up
the chain of command to the Medical Director. The delay
in identifying this need by both Dr. Dominguez and the
nursing staff led to the foreseeable downward spiral and
deterioration of this premature baby's condition which
culminated in cardio-respiratory arrest which is
directly related to her current condition.**

...

Sources: Guidelines of Perinatal Care, Fourth Edition,
AAP/ACOG; Neonatal Resuscitation Textbook, AHA/AAP,
Fourth Edition.

(Docket No. 80-3 at 1-2) (emphasis added).

In sum, the record shows that Dr. Adams relied on "[p]ertinent evidence based on scientifically valid principles..." *Daubert*, 509 U.S. at 597. Plaintiffs fulfilled their burden of establishing that Dr. Adams' expert testimony is reliable and will assist the trier of fact in understanding the evidence. *See* Martínez, 33 F.4th at 32-33 ("In sum, the medical records, combined with Dr. Ortiz Feliciano's own clinical experience, provided a sufficiently reliable basis for his opinions. . .").

Wherefore, the Court finds that Dr. Adams' expert testimony meets the Daubert threshold. The Court further concludes that his Expert Report, along with his Supplemental Report, complies with

Civil. No. 21-cv-01286(GMM)
Page -18-

Fed. R. Civ. P. 26(a)(2)(B). Defendant's *in limine* request is
DENIED.

**II.   MOTION FOR SUMMARY JUDGMENT**

Defendant premises its summary judgment request on Puerto
Rico law seeking that Plaintiffs submit admissible expert
testimony to prove causation in medical malpractice suits. The
Court DENIES Defendant's request. Dr. Adams' expert testimony is
reliable and relevant. *See* discussion *supra* Section I.C.

**A. Summary Judgment Standard**

Fed. R. Civ. P. 56(c)

Fed. R. Civ. P. 56 governs motions for summary judgment. "The
court shall grant summary judgment if the movant shows that there
is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
There is a genuine dispute in a material fact "if the evidence
about the fact is such that a reasonable jury could resolve the
point in favor of the non-moving party." Johnson v. University of
Puerto Rico, 714 F.3d 48, 52 (1st Cir. 2013) (*quoting* Thompson v.
Coca-Cola Co., 552 F.3d at 175); *see also* Sánchez v. Alvarado, 101
F.3d 223, 227 (1st Cir. 1996); Rivera-Muriente v. Agosto-Alicea,
959 F.2d 349, 352 (1st Cir. 1992). In turn, a fact is material "if
it has the potential of determining the outcome of the litigation."

Maymi v. Puerto Rico Ports Authority, 515 F.3d 20, 25 (1st Cir. 2008) (*citing* Calvi v. Knox County, 470 F.3d 422, 426 (1st Cir. 2006)).  In making its determination, the Court will look to "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits. . ." Johnson, 714 F.3d at 52 (*citing* Thompson, 522 F.3d at 175).

The movant has "the initial burden of 'demonstrate[ing] the absence of a genuine issue of material fact' with definite and competent evidence." Arroyo-Ruiz v. Triple-S Management Group, 258 F.Supp.3d 240, 245 (D.P.R. 2017) (*quoting* Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013)). "Once the moving party has properly supported [its] motion for summary judgment, the burden shifts to the nonmoving party, with respect to each issue on which [it] has the burden of proof, to demonstrate that a trier of fact reasonably could find in [its] favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (*quoting* DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997)). Indeed, the non-movant is required to "present definite, competent evidence to rebut the motion." Martínez-Rodríguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) (*quoting* Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).

Civil. No. 21-cv-01286(GMM)
Page -20-

Further, the Court must "draw [] all reasonable inferences in favor of the non-moving party while ignoring conclusory allegations, improbable inferences, and unsupported speculation." Smith v. Jenkins, 732 F.3d 51, 76 (1st Cir. 2013). The Court must also refrain from engaging in assessing the credibility or weight of the evidence presented. *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Local Civ. R. 56

Local Civ. R. 56 also controls motions for summary judgment. *See* Local Civ. R. 56. In sum, it requires from the non-movant to "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." Local Civ. R. 56(c). If the fact is not admitted, "the opposing statement shall support each denial or qualification by a record citation. . ." Id. In its opposing statement, the non-movant can include additional facts supported by record citations. *See* Id. In turn, the movant "shall submit with its reply a separate, short, and concise statement of material facts, which shall be limited to any additional fact

submitted by the opposing party." Local Civ. R. 56(d). In its statement, the movant shall admit, deny, or qualify those additional facts. *See* Id. Any denial and qualification that the movant raises must be supported by a record citation. *See* Id.

Failure to comply with Local Rule 56(c) gives the Court the ability to accept a party's proposed facts as stated. *See* Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); Natal Pérez v. Oriental Bank & Trust, 291 F.Supp.3d 215, 219 (D.P.R. 2018) ("If a party improperly controverts the facts, Local Rule 56 allows the Court to treat the opposing party's facts as uncontroverted."). Litigants ignore Local Rule 56(c) at their peril. *See* Id.

## B. Findings of Fact

Foremost, the Court finds that Defendant's *Response to Plaintiff's Proposed Statement of Additional Material Facts as to the First Motion for Summary Judgment* (Docket No. 95-1) is, at a minimum, unpersuasive. Instead of refuting Plaintiff's proposed additional statement of facts (Docket No. 85-11 at 12-17) with record citations, as required by Rule 56, Defendant's strategy is striking Dr. Adams' Unsworn Statement Under Penalty of Perjury (Docket No. 85-1) by opining that it's a sham affidavit. (Docket No. 95). There is no basis for this conclusion.

Civil. No. 21-cv-01286(GMM)
Page -22-


     As a general matter, "an affidavit is equivalent to other
forms of evidence, such as deposition testimony." Ayala v. Kia
Motor Corporation, Civil No. 19-1150, 2022 WL 4719145 at *3 (D.P.R.
2022) (citing 10A Wright & Miller, Federal Practice & Procedure §
2727 (3d ed. 2011)). However, when a party or an interested witness
"has given clear answers to unambiguous questions in discovery,
[they] cannot create a conflict and resist summary judgment with
an affidavit that is clearly contradictory, unless there is a
satisfactory explanation of why the testimony [has] changed."
Escribano-Reyes v. Professional Hepa Certificate Corp., 817 F.3d
380, 386 (1st Cir. 2016) (quoting Hernández-Loring v. Universidad
Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)) (internal
quotations omitted); Colantuoni v. Alfred Calcagni & Sons, Inc.,
44 F.3d 1, 4-5 (1st Cir. 1994). This being said, "[a] subsequent
affidavit that merely explains, or amplifies upon, opaque
testimony given in a previous deposition is entitled to
consideration in opposition to a motion for summary judgment."
Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 26 (1st
Cir. 2002); see also Shepherd v. Slater Steels Corp., 168 F.3d
998, 1007 (7th Cir. 1999) ("[W]here the deposition testimony is
ambiguous or incomplete, as it is here, the witness may

Civil. No. 21-cv-01286(GMM)
Page -23-

legitimately clarify or expand upon that testimony by way of an affidavit.").

Notably, Defendant did not develop argumentation as to contradictions, or demonstrative or manifest discrepancies, in Dr. Adams' affidavit with prior testimony. As such, the Court deems Defendant's argument waived. *See* Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); Rivera-Gomez, 843 F.2d at 635 (*quoting* Paterson-Leitch Co., 840 F.2d at 990 ("Judges are not expected to be mindreaders. Consequently, a litigant has an obligation 'to spell out its arguments squarely and distinctly,' or else forever hold its peace.").

Nevertheless, the Court examined Dr. Adams': (i) Expert Report; (ii) Supplemental Report; (iii) deposition testimony; and (iv) affidavit, and couldn't identify contradictions that would deem Dr. Adam's affidavit a sham. The Court DENIES Defendant's request to strike Dr. Adams' Unsworn Statement Under Penalty of Perjury.

After crediting only material facts supported by accurate record citations, the Court finds the following facts are uncontested:

Civil. No. 21-cv-01286(GMM)
Page -24-

1.  After 34 weeks gestation, P.V.M. was born on July 13, 2000, at 12:55 AM, through spontaneous vaginal delivery in Menonnite General Hospital, Aibonito, Puerto Rico, to Arcelis Miranda. (Docket Nos. 1 ¶ 3.2 and 15 ¶ 3.2).

2.  P.V.M.'s Apgar scores were 7 and 9. (Docket No. 85-3 at 33).

3.  Dr. Ramón Domínguez Roche ("Dr. Domínguez") was a pediatrician at Menonnite General Hospital at the time of P.V.M.'s birth. (Docket Nos. 85-3 at 33, and 95-1 ¶ 6).

4.  Defendant assigned Dr. Domínguez as the pediatrician in charge of P.V.M. during her admission at the hospital on July 13 and July 14 of the year 2000. (Docket No. 95-1 ¶ 7).

5.  Defendant does not have and did not have a NICU between July 13 and July 14 of the year 2000. (Docket Nos. 95-1 ¶ 2 and 85-6 at 2, ¶ 16).

6.  Defendant is a basic care facility. (Docket No. 85-9 at 279).

7.  Nurse Elizabeth David Rodríguez ("Nurse David") documented that on July 13, 2000, at 1:00 AM, P.V.M. "was observed cyanotic retracting nasal flaring, forced respirations. Placed in Oxyhood at sixty (60) percent. . ." (Docket No. 85-3 at 14).

8.  On July 13, 2000, at 1:25 AM, P.V.M. was admitted into the nursery. (Docket No. 85-9 at 107).

9.  Nurse David documented that on July 13, 2000, at 2:00 AM, P.V.M. was placed in an incubator. P.V.M. was on IV fluids and indirect oxygen at sixty (60) percent. (Docket No. 85-3 at 15).

10. Nurse David documented that on July 13, 2000, at 4:30 AM, P.V.M.'s oxygen saturation was 96%. (Docket No. 85-3 at 15).

Civil. No. 21-cv-01286(GMM)
Page -25-

11. On July 13, 2000, at 11:00 AM, P.V.M.'s oxygen
    saturation was 97%. (Docket No. 85-3 at 51).

12. For 13.5 hours, no further oxygen saturation was
    documented. (Docket No. 85-3 at 51-52).

13. Nurse Hermelinda Aponte-Berrios ("Nurse Aponte")
    documented that on July 13, 2000, at 7:00 PM, P.V.M.
    was observed to be "poor crying, breathing with
    difficulty, assisted with oxygen at sixty (60)
    percent. Presents deep respirations. Slight
    synopsis episode." P.V.M. also presented vomit with
    abundant brown particles. (Docket No. 85-4 at 18
    and 60). Dr. Domínguez was notified of the above.
    (Docket No. 85-4 at 18).

14. On July 13, 2000, at 7:00 PM, P.V.M. presented
    continued retractions, "[f]ast respirations one
    hundred (100) per minute" and was cyanotic. (Docket
    No. 85-4 at 18). At 10:00 PM, Nurse Aponte notified
    Dr. Domínguez of the above. (Docket No. 85-4 at
    18). Dr. Domínguez ordered that P.V.M. continue NPO
    (nothing by mouth) and IV antibiotics. (Docket No.
    85-4 at 18 and 60).

15. P.V.M. continued having cyanotic episodes on July
    13, 2000, at 11:00 PM. (Docket No. 85-4 at 18 and
    61).

16. On July 14, 2000, at 12:00 AM, Dr. Domínguez ordered
    Oxyhood at 50 or 60% saturometry every two (2)
    hours, and a portable chest x-ray. (Docket No. 85-
    4 at 18 and 61).

17. Nurse Aponte documented P.V.M.'s oxygen saturation
    to be at 85% on July 14, 2000, at 12:30 AM (Docket
    No. 85-4 at 18-19). P.V.M. had respirations at 100
    per minute, with an irregular respiratory block.
    (Docket No. 85-4 at 19 and 61).

Civil. No. 21-cv-01286(GMM)
Page -26-

18.  Nurse Aponte documented P.V.M.'s oxygen saturation
     to be at 62% on July 14, 2000, at 1:30 AM (Docket
     No. 85-4 at 19 and 61).

19.  Nurse Aponte documented P.V.M.'s oxygen saturation
     to be at 51% on July 14, 2000, at 2:45 AM (Docket
     No. 85-4 at 19 and 61).

20.  On July 14, 2000, at 3:10 AM, Nurse Aponte
     documented that Dr. Domínguez decided to transfer
     P.V.M. (Docket No. 85-4 at 19 and 64).

21.  Nurse Aponte documented that on July 14, 2000, at
     4:00 AM, Dr. Domínguez intubated and then extubated
     P.V.M. (Docket No. 85-4 at 20 and 64).

22.  Nurse Aponte documented that intubation was not
     achieved and that P.V.M. went into
     cardiorespiratory arrest on July 14, 2000, at 5:30
     AM. (Docket No. 85-4 at 20 and 64).

23.  P.V.M. was recorded to be cyanotic at this time.
     (Docket No. 85-4 at 20 and 64).

24.  Nurse Aponte documented that, on July 14, 2000, at
     6:00 AM, P.V.M. was hypoactive, cyanotic, and
     hypothermic. (Docket No. 85-4 at 20 and 64).

25.  On July 14, 2000, at approximately 6:30 AM, Dr.
     Betancourt intubated P.V.M. (Docket No. 85-4 at 20
     and 64).

26.  The intubation of P.V.M. could not be completed for
     two and a half hours. (Docket Nos. 85-9 at 249).

27.  On July 14, 2000, at 9:00 AM, P.V.M. was transferred
     to St. Lucas Episcopal Hospital. (Docket Nos. 80-2
     at 2 and 85-1 at 32).

### C. Applicable Law

Puerto Rico substantive law applies since this is a diversity action. *See* Roja-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de Puerto Rico, 94 F.3d 40, 43 (1st Cir. 2005) (*citing* Erie R.R. Co. V. Tompkins, 304 U.S. 64, 92 (1938)). It provides that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 P.R. Laws Ann. § 5141.[5] A plaintiff must establish three elements to prevail in a medical malpractice suit: "(1) the duty owed (i.e., the minimum standard of professional knowledge and skill required in the relevant circumstances), (2) an act or omission transgressing that duty, and (3) a sufficient causal nexus between the breach and the claimed harm." Cortés-Irizarry, 111 F.3d at 189 (*citing* Lama, 16 F.3d at 478; Rolón-Alvarado, 1 F.3d at 77).

"Puerto Rico holds health care professionals to a national standard of care." Rojas-Ithier, 394 F.3d at 43. There is a presumption that physicians exercised reasonable care. *See*

---

[5] This citation corresponds to the 1930 Puerto Rico Civil Code. The 1930 Puerto Rico Civil Code was abrogated by 31 P.R. Laws Ann. § 5311 et seq. ("2020 Puerto Rico Civil Code"). However, the 2020 Puerto Rico Civil Code provides that tort liability is governed by the law in force at the time when the act or omission that gave rise to the tort liability took place. *See* 31 P.R. Laws Ann. § 11720. The 1930 Puerto Rico Civil Code was in force when the events that gave rise to this malpractice case took place.

Martínez, 33 F.4th at 23. As such, a plaintiff "ordinarily must adduce expert testimony to limn the minimum acceptable standard and confirm the defendant doctor's failure to meet it." Id. (*quoting* Cortés-Irizarry 111 F.3d at 190). Without said testimony, "a trier of fact is rarely able to determine the applicable standard of care in the medical profession." Roja-Ithier, 394 F.3d at 43 (*citing* Rolón-Alvarado, 1 F.3d at 78). Likewise, "a factfinder normally cannot find causation without the assistance of expert testimony to clarify complex medical and scientific issues that are more prevalent in medical malpractice cases than in standard negligence case." Id. (*citing* Lama, 16 F.3d at 478).

### D. Analysis and Conclusion

Defendant's sole basis to request summary judgment is its Daubert claim. The Court, however, denied it. As it stands, it is undisputed that Plaintiffs furnished admissible expert testimony that articulated: (i) a national standard of care; (ii) a position as to why Defendant failed to act according to a standard of care; and (iii) a causal nexus between the breach of a standard of care and the claimed harm. Plaintiffs, accordingly, could present evidence before the trier of fact in trial to establish a medical malpractice claim. In turn, Defendant could refute Dr. Adams'

**Civil. No. 21-cv-01286(GMM)**
**Page -29-**

expert testimony in trial. The Court DENIES Defendant's request

for summary judgment at Docket No. 80.


     IT IS SO ORDERED.

     In San Juan, Puerto Rico, June 1, 2023.



                    <u>s/Gina R. Méndez-Miró</u>
                    GINA R. MÉNDEZ-MIRÓ
                    UNITED STATES DISTRICT JUDGE